**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JONATHAN JEAN-PIERRE, Plaintiff, v. GOOGLE LLC, Defendant. | **JURY DEMANDED** Case No. 1:25-cv-10004 |

# COMPLAINT

1. Employers have clear obligations under federal, state, and local law to ensure that reductions in force are not carried out in a discriminatory manner. When a large company relies on opaque or discretionary processes, those systems predictably produce discriminatory outcomes. Some corporate employment policies and practices are structured to prevent discrimination before it occurs; others are structured to prioritize covering up or obscuring discriminatory selections when they occur. This case concerns the latter issue.

2. This action challenges the predictable discrimination enabled by Google LLC's ("Google") human resources practices. Through fragmented "micro layoffs,"[1] Google allows its managers convenient cover to target employees in a discriminatory manner, while broadly

[1] Plaintiff's counsel uses the term "micro layoff" to succinctly describe the nature of Google's practice. A January 2024 report from Bloomberg refers to Google's "micro-layoffs" per an unnamed Google employee. *See* Julia Love & Davey Alba, *Google Lays Off Hundreds in Hardware, Assistant, Engineering*, Bloomberg (via Yahoo Finance) (January 11, 2024), available at https://finance.yahoo.com/news/google-lays-off-hundreds-hardware-041348770.html (last accessed December 1, 2025). Discovery will shed light on whether Google itself regularly employs the term "micro layoff," "micro cuts" or similar terminology to describe its scheme.

concealing or obscuring statistical discriminatory patterns that would otherwise reveal inequitable outcomes resulting from Google's overly subjective layoff practices.

3. Plaintiff Jonathan Jean-Pierre ("Mr. Jean-Pierre" or "Plaintiff"), a Black Human Resources ("HR") professional with documented disabilities, immediately realized his rights were violated when he received notice of his targeted termination just ***one day*** before his planned medical leave and ***one day*** before Google announced a HR department-wide "Voluntary Exit Program" ("VEP") that could have rendered involuntary layoffs unnecessary. Google's corporate HR and Employee Relations teams were aware of Plaintiff's medical needs when approving his manager's termination request. This decision exposes a structural failure within Google's HR organization, revealing that HR lacked the oversight needed to protect even its own HR team from retaliation.

4. As an experienced HR Professional who worked within Google's Office of the Chief People Officer for nearly four years and later on the Business HR team supporting workforce-planning efforts for the Platforms and Devices product area, Mr. Jean-Pierre had personally raised concerns about Google's shift in how it plans and executes layoffs. During his final year of employment with Google, Plaintiff questioned whether Google too hastily planned and executed layoffs, without adequately vetting the selection process to prevent discriminatory selections. When he raised related issues, his concerns were generally ignored or dismissed, as Google appeared willing to accept a level of discrimination (or, as Google might frame it, "risk") rather than address or at least minimize the discrimination.

5. Based on his HR expertise, Plaintiff understood that inconsistent inputs in Google's people processes would produce biased outcomes in micro layoff selections, allowing inequity to persist under the guise of business restructuring. His concerns fell on, or largely fell

on, deaf ears. These underlying issues ultimately allowed Plaintiff to be targeted by his own manager, whose training and experience were focused on business operations and strategy rather than HR compliance. Plaintiff was terminated in an unlawful manner, despite his stellar performance record over seven years at Google and the absence of any legitimate justification for the supposed (and false) elimination of his HR Program Manager position.

6. Plaintiff, represented by ZLR Litigation, PLLC, alleges based on information and belief at all relevant times as follows:

## I. EXECUTIVE SUMMARY

7. Google violated Plaintiff's statutory rights when it wrongfully terminated him, a high-performing human resource professional with disabilities, just one day before his Family and Medical Leave Act ("FMLA") leave and one day before Google announced a HR department-wide "Voluntary Exit Program" or "VEP" that necessarily would affect whether involuntary reductions were even necessary, and if so, what positions might be impacted. Legitimate workforce planning, free of subjective bias, would have required analyzing restructuring needs and decisions only after considering the specific positions eliminated by the VEP, not before.

8. This case, therefore, challenges a sophisticated form of discrimination where Defendant Google exploited its so-called "micro layoff" infrastructure to target Plaintiff, a Black human resource professional with ongoing medical conditions that Google did not wish to reasonably accommodate (as required by law).

9. No legitimate workforce planning would effectuate involuntary layoffs the day before a department-wide voluntary exit program is implemented. The purpose of voluntary exit programs is to reduce or eliminate the need for involuntary cuts. The only plausible explanation

is that Google used its "micro layoff" process to ensure that Plaintiff (and likely others who have engaged in protected activity) were targeted as part of alleged restructuring under the pretext of business necessity.

10. Google has also faced recent class-wide allegations of systemic inequities in its HR practices, culminating in a $50 million settlement (subject to court approval) resolving claims brought by Black employees alleging under-leveling, pay disparities, and barriers to advancement.[2] *See* generally, *Curley v. Google LLC*, No. 4:22-cv-01735 (N.D. Cal.).

11. Current research in industrial and organizational psychology shows that employment systems relying on subjective or decentralized decision-making without adequate safeguards can predictably result in systemic discrimination.[3] *See*, e.g., George B. Cunningham & Harper R. Cunningham, *Bias among managers: Its prevalence across a decade and comparison across occupations*, 13 Front. Psychol. 1034712 (2022) (an analysis of approximately a decade of data finding that managers often exhibit implicit and explicit bias across race, disability, gender, and sexual orientation, which the authors found can result in workplace disparities and that "bias reduction strategies" are necessary), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC9692076/ (last accessed December 1, 2025). Google's current HR practices exemplify that risk.

---

2 *See generally*, Jonathan Stempel, *Google settles Black employees' racial bias lawsuit for $50 million*, Reuters (May 9, 2025), available at https://www.reuters.com/legal/google-settles-black-employees-racial-bias-lawsuit-50-million-2025-05-09/ (last accessed December 1, 2025).

3 An employer's managers may not use layoffs to unlawfully target employees. The Second Circuit recognizes that employers cannot hide behind alleged legitimate workforce restructuring that "masks, in an individual case, a discriminatory animus." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1221 (2d Cir. 1994) ("Where an employee can show that reduction in force was a pretext for her discharge and she alleges facts which, if believed, would prove intentional discrimination against her because of her age, summary judgment is inappropriately granted the employer.").

12. By simultaneously executing small, targeted, and discretionary involuntary layoffs concurrently with a sweeping Voluntary Exit Program, Google created a dual-selection mechanism for layoffs that enables systematic targeting of employees based on protected activity or characteristics while concealing aggregate evidence of bias, including in Plaintiff's case. In essence, by characterizing layoff decisions as micro layoffs consisting of relatively small numbers, Google structures its workforce reductions in a way that conceals patterns of bias. This fragmentation knowingly sidesteps meaningful statistical review and masks patterns of disparate treatment that would become evident if analyzed collectively.

13. Google's discriminatory acts here are revealed by its illogical and pretextual execution of the so-called layoff targeting Plaintiff, as well as ample evidence reflecting discriminatory and retaliatory motives in terminating Plaintiff, such as, but not limited to, recruiting for his same, or a virtually indistinguishable role, HR Program Manager, in the aftermath of his termination.

14. Google's "micro layoff" framework reflects a broader corporate culture that too often prioritizes obscuring corporate liability when it occurs rather than ensuring compliance with the law. Large companies with thousands of employees are unfortunately going to have instances of legal violations and discrimination. Yet far too often, corporate employment policies accept too high a level of willful, obvious, and known compliance failures rather than maximizing efforts to eliminate discrimination.

15. This case seeks to hold Google accountable for violating federal, state, and local civil-rights laws through a discriminatory and retaliatory campaign that exploited corporate restructuring as cover for systematic targeting of a disabled, Black HR professional, who

exercised his legal rights to request reasonable accommodations and to challenge workplace discrimination.

16. Plaintiff brings the following causes of action: (1) Disability Discrimination under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 ("NYCHRL"); (2) Failure to Engage in Cooperative Dialogue under the NYCHRL, N.Y.C. Admin. Code § 8-107(28); (3) Disability Discrimination under the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"); (4) Race Discrimination under the NYCHRL, N.Y.C. Admin. Code § 8-107; (5) Race Discrimination under the NYSHRL, N.Y. Exec. Law § 296; (6) Retaliation under the NYCHRL, N.Y.C. Admin. Code § 8-107; (7) Retaliation under the NYSHRL, N.Y. Exec. Law § 296; (8) Interference with Rights under the Family and Medical Leave Act, 29 U.S.C. § 2615(a)(1) ("FMLA"); (9) Retaliation under the FMLA, 29 U.S.C. § 2615(a)(2); and (10) Violation of New York Labor Law Section 215, N.Y. Lab. Law § 215.

## II. PARTIES

17. Plaintiff Jonathan Jean-Pierre is an individual who resides in New York, New York. Mr. Jean-Pierre was employed by Defendant Google LLC as an HR professional from August 27, 2018 to June 1, 2025.

18. Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google conducts business throughout the United States, including within the State and City of New York, where Plaintiff Mr. Jean-Pierre was employed.

## III. JURISDICTION, VENUE, AND ELECTION OF RIGHTS

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1367 (supplemental jurisdiction over state-law claims), and pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District, including Mr. Jean-Pierre's work location and Google's New York City operations.

21. Pursuant to N.Y.C. Admin. Code § 8-502(a), Plaintiff elects to pursue his claims under the New York City Human Rights Law through this civil action rather than through administrative proceedings before the New York City Commission on Human Rights.

22. In accordance with N.Y.C. Admin. Code § 8-502, Plaintiff has mailed or will mail a copy of this complaint to the New York City Commission on Human Rights within ten (10) days of filing this action.

## IV. FACTUAL ALLEGATIONS

### A. Google's Micro Layoff Practices and 2025 Voluntary Exit Program Targeting HR

23. Beginning in 2025, Google implemented a coordinated workforce reduction strategy across the company and within its HR Department, combining small, targeted involuntary terminations ("micro layoffs") with so-called Voluntary Exit Programs ("VEPs").

24. This dual system granted managers and HR discretion to determine which employees would receive favorable VEP terms, such as continued employment through July 2025 (in the case of NY-based employees), extended health coverage, and additional equity vesting, and which employees would instead be subject to involuntary termination with lesser severance and benefits and earlier exit dates. The absence of uniform criteria for and the review

of these determinations created a substantial risk of discriminatory selections and inconsistent treatment among similarly situated employees.

25. Google's selection mechanism for micro layoffs often lacks objective, transparent criteria. Instead, managers are given broad selection criteria, which can often lead to subjective decision-making. Indeed, one factor managers are permitted to consider is the employee's location, which can and often is used to target individuals working remotely due to their need for reasonable accommodations due to their disability or medical conditions. Google knows that a disproportionate or substantial number of individuals granted permission to work remotely have medical or disability-related needs.

26. Within the past year, Google has consistently forecasted to managers that they should "crack down" on remote work,[4] without adequately making necessary exceptions for employees working remotely as a reasonable accommodation for known disabilities or medical conditions.

27. In other words, managers are being directly and indirectly encouraged to treat individuals who have received legal accommodations to work remotely negatively in employment actions. This pattern and practice turns, on its head, the "reasonable accommodation" and "good faith interactive (or cooperative dialogue) process" required under New York City law.

28. In the case of Plaintiff, it was expressly known by his managers and Google's HR team that he needed to work remotely to reasonably accommodate his medical conditions and disabilities.

---

[4] *See*, e.g., Patricia Battle, *Google quietly restricts generous workplace policy for employees*, TheStreet (Oct. 14, 2025), available at https://www.thestreet.com/employment/google-quietly-restricts-generous-workplace-policy-for-employees (reporting that Google recently began cracking down on remote work in its company culture) (last accessed December 1, 2025).

29. Google's micro layoff framework systematically obscures statistical evidence of discriminatory patterns by fragmenting workforce reductions into small, discrete events that appear neutral when viewed in isolation but reveal targeted disparities when analyzed collectively.

30. Unlike more traditional layoff plans, Google's micro layoff framework grants individual managers broad discretion to select employees for termination under the guise of restructuring, enabling bias to influence selection decisions while maintaining plausible deniability. In practice, Google has conducted rolling, company-wide workforce reductions while allowing individual managers to make subjective selection decisions that are too often divorced from Google's legitimate workforce planning initiatives.

31. Google's employment actions, when viewed in context, reveal significant demographic disparities. Underlying HR processes, such as performance ratings, calibration, and promotion readiness, reflect consistent racial and disability-based gaps.

32. In Plaintiff's case, he was assigned as an HR Program Manager supporting a growth area of Google's business, and there was unlikely to be any headcount target required to be met for his segment of Google's HR Department. Instead, his manager used Google's broader pattern of engaging in frequent "micro layoffs," effectively part of a larger restructuring, to target him just before his planned medical leave.

33. Google possesses extensive data and analytical capabilities that can reveal the discriminatory patterns embedded in its micro layoff practices, including disparate treatment of disabled employees and employees of color. Yet it deliberately structures its layoff process to obscure the purported rationale for analyzing its layoff data on an aggregate basis, preventing the statistical detection of these predictable and known disparities.

34. Put differently, Google can more readily (and willfully) discount or ignore circumstantial (and potentially direct) evidence of discriminatory selections by obscuring statistical trends that would further corroborate discriminatory treatment.

35. If Google prioritized compliance with its employees' statutory protections over speed in executing layoffs, discriminatory layoffs like those faced by Plaintiff could be prevented. Google has vast resources and can plan and implement its layoffs in a way that eliminates or greatly reduces discrimination. Yet the company deliberately structures its layoff processes to avoid aggregate analysis and obscure disparate treatment that its own data could readily reveal.

**B. Plaintiff's Exemplary Performance History and Value to Google**

36. Plaintiff Jean-Pierre began his employment with Google around August 2018 as an experienced HR professional holding a master's degree in HR. During his employment, he held progressively senior roles across multiple HR teams supporting Google's HR function, consistently earning strong performance ratings and recognition.

37. In his first performance cycle, Mr. Jean-Pierre received an "Exceeds Expectations" rating, an uncommon performance result for new hires at Google. Over his seven-year tenure, he continued to receive "Exceeds Expectations" or "Meets Expectations" ratings, with the latter occurring only during transitions into newly expanded or promotional roles. His consistent performance led to accolades and recognition from Google management, including, but not limited to, increased equity refresh grants annually, reflecting his leadership potential and impact at Google and HR.

38. Mr. Jean-Pierre's recent recognition included a spot bonus from a VP of HR for Platforms & Devices in January 2025 for his leadership in launching the Platforms & Devices

VEP support model, multiple peer bonuses from colleagues including a now-Director of HR who called him a "force to be reckoned with," and strong feedback from senior HR leaders, including several HR Directors (and multiple VPs reporting directly to Google's current and former Chief People Officers) throughout his tenure at Google.

39. Mr. Jean-Pierre has never been subject to any discipline, write-ups, suspensions, or demotions. His consistent record demonstrates continuous advancement and value to Google's HR organization, and he is precisely the type of employee any corporation would be fortunate to recruit and retain.

40. While employed at Google, Mr. Jean-Pierre obtained an MBA from Duke University, where he was recognized by Poets and Quants (2025) as one of its *Best & Brightest Executive MBA graduates*. This recognition, combined with his leadership achievements at Google, underscored his trajectory as a rising HR leader and his growing strategic value to the company and any HR leadership team.

41. At the time of his termination, Mr. Jean-Pierre was working on Google's Platforms and Devices HR Team, supporting workforce planning, organizational health for a major growth area within Google's business and people strategy. There was no indication of a headcount-reduction target for his segment of the HR function, rendering his termination particularly suspect.

42. Mr. Jean-Pierre and his team managed a high volume of work that continued following Google's termination decision, demonstrating that his role remained essential to business operations and long-term company strategy.

43. In the aftermath of Plaintiff's termination, Google began recruiting for an HR Program Manager position on his team, focused on organizational health and HR programs, the same core work Mr. Jean-Pierre had performed.

**C. Plaintiff's Disability Status and Reasonable Accommodation Requests**

44. While working on Ms. Lopez's team, he experienced chronic medical impairments involving somatic pain, bleeding, and cardiac symptoms that required ongoing medical monitoring and intervention. Plaintiff has multiple qualifying disabilities, including Panic Disorder (episodic paroxysmal anxiety), Generalized Anxiety Disorder, Recurrent Major Depressive Disorder (severe, without psychotic features), and Attention-Deficit/Hyperactivity Disorder.

45. In or around August 2023, Plaintiff requested and was granted a disability accommodation to work remotely. Under Google's hiring and accommodation process, any request requiring continued remote work must be reviewed by the hiring manager to determine whether it would pose an undue hardship *before* an offer letter is issued and accepted. Plaintiff's then-manager, Ms. Lopez, reviewed and approved the request in advance, confirming that the accommodation did not create any hardship for the team and business. The arrangement was medically necessary to manage his conditions while continuing to support West Coast and global teams, often working extended hours until 8:00 or 9:00 p.m. Eastern Time.

**D. Plaintiff's Transfer to New HR Team and Discriminatory Treatment**

46. In December 2023, Plaintiff met with Ms. Lopez, an HR leader and chief of staff for the Platforms & Devices HR organization, regarding an internal opening on her team. During this interview, Plaintiff expressly stated that he had been granted a disability accommodation to

work remotely and that it was crucial that he be able to continue that accommodation should he accept the position.

47. Ms. Lopez made commitments crucial to Plaintiff's decision to transfer to her team, knowing that his former manager had already formally submitted a Level 6 ("L6") promotion nomination through Google's internal promotion and performance management system ("GRAD"). At Google, the L6 level signifies expanded middle-management responsibilities and a broader leadership scope in the organization. In the prior review cycle, the promotion committee had provided positive feedback. In deciding to accept Ms. Lopez's offer, Plaintiff reasonably relied on these representations and the expectation that his promotion would be reconsidered in the next cycle.

48. Ms. Lopez agreed that Plaintiff's existing disability accommodation for remote work would be honored.

49. Ms. Lopez also agreed that Plaintiff would be nominated for promotion from L5 to L6 in the March 2024 promotion cycle.

50. In the months following his transfer, Plaintiff began to experience differential treatment and resistance to his accommodation. Ms. Lopez held a bias against his need for accommodation and failed to engage in the cooperative dialogue required under the New York City Human Rights Law when he raised concerns about hostile treatment and reasonable work boundaries given his medical conditions.

51. During team meetings led by a VP of HR and another HR staff member supporting Google-wide employee low-performance and remote-work reduction initiatives, statements were made that remote work "was something Google was no longer supportive of" (or words to that effect), creating a hostile environment for employees requiring medical

accommodations. These comments carried a clear implication for employees like Plaintiff with disabilities who required remote work as a medical accommodation.

52. One of the VP's direct reports further commented to the effect that "the company has moved away from debate to now this is the decision," underscoring that remote-work accommodations were discouraged and that discussion or concern about the implications was not welcome.

53. On at least one occasion, Ms. Lopez reiterated her objections to Plaintiff's remote-work status, pressuring him to abandon his medical accommodation without legitimate business justification. Despite acknowledging that Plaintiff had no day-to-day coworkers or business partners based in New York, Ms. Lopez instructed Plaintiff to work from the Google New York City office.

54. A VP of HR and other HR staff also made statements suggesting that employees were "abusing" short-term medical leave in an HR team meeting. Although the VP of HR later clarified that the concern did not apply to everyone, the statements nevertheless created a chilling effect that discouraged protected activity and left team members with the impression that taking protected leave would be viewed negatively.

**E. Adverse Actions Targeting Plaintiff and an Increasingly Hostile Work Environment**

55. Rather than honoring her promotion commitment, Ms. Lopez deliberately failed to submit Plaintiff's L6 promotion nomination in March 2024, despite his documented readiness for advancement and his prior manager having already submitted the nomination in Google's internal system during the previous promotion cycle.

56. When Plaintiff asked Ms. Lopez about the status of his promotion nomination, she repeatedly gave vague or non-committal responses for weeks, further reinforcing that the commitment was not being honored.

57. Ms. Lopez assigned Plaintiff an unreasonably high workload for months, requiring him to rebalance responsibilities, train new and tenured team members, and assume duties typically handled by the team's manager. His workload was high compared to his peers in an apparent campaign to induce his resignation or create an alleged justification for future adverse actions. Plaintiff's peers even expressed concern for his health, observing that he was working past midnight often to keep pace while workload distribution remained uneven for months.

58. Despite Plaintiff's continued performance and peer recognition, Ms. Lopez provided inconsistent and contradictory feedback designed to undermine his career progression, downplaying his contributions even as peers and business executives continued to praise his work.

59. When Plaintiff's health deteriorated due to the hostile work environment, and he raised concerns directly with his manager in September 2024, Google failed to engage in cooperative dialogue about additional accommodations he might need, as required by the New York City Human Rights Law.

**F. Plaintiff's Protected Complaints and Google's Retaliatory Response**

60. In or around mid-September 2024, during a Google team offsite in California, Plaintiff complained directly to Ms. Lopez about discriminatory treatment, specifically addressing the high workload, hostile environment, inequitable treatment, and impact on his health. In the presence of peers, given Plaintiff's concern about retaliation, he sought solutions

and attempted to engage Ms. Lopez in good-faith, cooperative dialogue about how she might be able to further accommodate his need to protect his health.

61. Rather than addressing these concerns, Ms. Lopez responded dismissively and defensively, informing Plaintiff that during points in her career her mental health suffered dramatically, and she effectively told him he had to stomach it and get through it. Her response reflected a broader culture at Google that discouraged employees from seeking accommodations. The message to Plaintiff was clear: do not complain, or it will just hurt your career.

62. Unfortunately, Ms. Lopez proved herself correct by terminating him in retaliation shortly thereafter.[5]

63. Following this protected complaint, Ms. Lopez escalated her discriminatory conduct through increased performance scrutiny not given to peers, exclusion from opportunities and key meetings, pressure to abandon his remote work accommodation, and hostile questioning about his career plans.

64. In December 2024, when Plaintiff informed Ms. Lopez, of his need for medical leave, she gave minimal acknowledgment of his health needs and instead gave him an assignment to work on Google's Voluntary Exit Program launch planned for the Platforms & Devices organization, which resulted in the Plaintiff delaying the timing of his medical leave to complete the launch.

65. In other words, Plaintiff's direct manager and VP of HR understood that Google was preparing to implement a Voluntary Exit Program imminently and had Plaintiff working on this initiative, which was supposed to help reduce headcount without resorting to involuntary

---

[5] Managers working in high-stress environments are not perfect, and Plaintiff has empathy for past struggles Ms. Lopez may have had in the workplace. However, her message to him about not complaining or seeking reasonable accommodations reveals a larger issue within the culture at Google that Ms. Lopez was perpetuating and likely learned from her superiors.

terminations. That Plaintiff's manager still targeted him a day before this program was formally announced is considerable evidence of the illogical, retaliatory, and discriminatory decision to target Plaintiff when she did.

**G. Google's Discriminatory and Retaliatory Termination of Plaintiff**

66. On information and belief, within weeks after Plaintiff's December 2024 notice of needed medical leave, Ms. Lopez placed him on a termination list. Had Plaintiff been selected for termination *before* December 2024, he likely would have received notification sooner than he ultimately did. Google likely made the termination decision in January 2025, right after Plaintiff notified Ms. Lopez of his need for medical leave and additional accommodations. Nothing about Plaintiff's responsibilities or performance changed between his December disclosure of his medical leave need and the February termination, other than his intention to take protected leave.

67. On February 24, 2025, one day before Plaintiff's scheduled medical leave began, Ms. Lopez informed him via Google Meet video meeting that his position was allegedly being eliminated as part of a reduction-in-force.

68. Only a week prior, Plaintiff had conducted a transition call with his team to prepare for his medical leave, during which colleagues expressed support and wished him a speedy recovery. When Ms. Lopez learned that this transition had already been completed due to his impending medical leave, she abruptly ended the layoff call without discussing any next steps.

69. Google deliberately terminated Plaintiff to prevent him from taking protected medical leave and to ensure his termination before Google's imminent implementation of its Voluntary Exit Program, which may have made it more challenging, if not impossible, to attempt to justify the selection of Plaintiff for termination.

70. On February 25, 2025, the day after Plaintiff received his termination notice, Google announced a Voluntary Exit Program for HR employees that offered enhanced benefits, including extended health coverage continuing through July rather than June, continued stock vesting through the exit date, and full salary for the duration of the notice period. Because VEP participants were given time to consider and apply for the program, their exit dates generally extended into July (for NY/NJ-based employees and, in some cases, even months longer for critical talent), several weeks after the termination date applicable to Mr. Jean-Pierre.

71. By announcing the voluntary program immediately after Plaintiff's involuntary termination, Google ensured he would be excluded from being offered the more favorable terms available to other HR employees in the same circumstances.

72. Within Plaintiff's team alone, Google excluded him and at least one other Black employee reporting to Ms. Lopez. Upon information and belief, Black employees, such as Plaintiff, have been disproportionately targeted for involuntary layoffs and terminations. Indeed, Google recently settled a class action lawsuit for $50 million where the Plaintiffs alleged that Google systematically under-leveled and underpaid Black employees, denied advancement opportunities, and maintained internal systems that perpetuated race-based disparities.[6] This case reflects a similar discriminatory pattern manifested in how Plaintiff was treated at Google in the period prior to and leading up to his termination.

**H. Google's Discriminatory Motive Is Apparent**

73. Multiple factors establish Google's discriminatory and retaliatory motive in terminating Plaintiff:

---

[6] *See generally*, Jonathan Stempel, *Google settles Black employees' racial bias lawsuit for $50 million*, Reuters (May 9, 2025), available at https://www.reuters.com/legal/google-settles-black-employees-racial-bias-lawsuit-50-million-2025-05-09/ (last accessed December 1, 2025).

a. **Timing**: Plaintiff was notified of the termination notice one day before his protected medical leave, creating an overwhelming inference of retaliation for exercising rights under disability and leave laws;

b. **Voluntary Exit Program Exclusion**: The Chief People Officer announced a Voluntary Exit Program the day after Plaintiff's termination notice, offering extended benefits to other HR employees. The timing demonstrates Google's ability to provide favorable treatment when desired and reveals backward planning consistent with discriminatory targeting;

c. **Broken Commitments and Role Re-Creation**: Google simultaneously posted an HR program manager role on the same team, the very position Ms. Lopez promised Plaintiff when recruiting him, contradicting claims of workforce reduction and demonstrating that Google had an ongoing need for his work. Ms. Lopez's failure to honor her explicit promotion commitment and accommodation agreement reveals discriminatory animus and pretext;

d. **Selection Pattern**: At least two Black employees on the P&D HR team reporting to Ms. Lopez, each of whom held the same performance ratings as peers, were selected for role elimination and were terminated on or around June 1, 2025, indicating racial bias in the selection process. This pattern is consistent with broader examples of systemic bias within Google regarding the disparate treatment of Black employees. As previously indicated, there was no business need to terminate *any* employees within Plaintiff's team, so the fact that numerous Black employees were disproportionately targeted speaks to the broader issue of bias;

e. **Performance History**: Plaintiff's seven-year record of strong performance, including recent recognition from senior leaders within HR and the business, makes termination for any alleged business reason implausible;

f. **Accommodation Targeting**: Google's systematic pressure on Plaintiff to abandon his approved remote-work accommodation, coupled with a broader company stance against remote work, demonstrates disability-based animus;

g. **Growth Area**: Plaintiff worked in a growth area of Google's business where headcount reductions were unlikely, undermining claims of business necessity;

h. **Continued Workload**: The high volume of work and ongoing projects Plaintiff had managed continued uninterrupted after his termination, confirming that his duties remained essential to the business.

i. **Google's Effort to Fill Plaintiff's Position:** In the aftermath of Plaintiff's termination, Google began recruiting for an HR Program Manager position covering the same scope of organizational health and HR programs that Plaintiff had led. The timing and substance of this recruitment effort further confirm that his role was never eliminated, but reconstituted, underscoring the discriminatory, retaliatory, and pretextual nature of his termination.

74. The sequence of voluntary exit program announcement immediately after involuntary terminations contradicts legitimate workforce restructuring practices, which would offer voluntary departures before involuntary cuts to minimize legal exposure and employee relations damage.

75. Ms. Lopez had no basis to terminate or discipline Plaintiff for cause. His performance did not justify, and had never justified, a performance improvement plan over the course of his seven years, and his strong record would make any effort to terminate him for performance reasons obviously pretextual.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Discrimination Under New York City Human Rights Law (NYCHRL) - Disability

76. Plaintiff incorporates by reference all preceding paragraphs.

77. The NYCHRL provides uniquely broad protection against employment discrimination and must be construed liberally to accomplish its remedial purposes.

78. Plaintiff's documented mental health conditions and chronic medical impairments constitute covered disabilities under the NYCHRL.

79. Google treated Plaintiff "less well" than similarly situated non-disabled employees based on the factual allegations above, including, but not limited to, pressuring Plaintiff to abandon his reasonable accommodation, broken promotion promises, exclusion from opportunities, giving Plaintiff adverse assignments and an unreasonable workload, hostile treatment following protected complaints, discriminatory statements about remote work and medical leave abuse, exclusion from Google's VEP, and ultimate termination upon requesting medical leave.

80. Google's conduct violates the NYCHRL's prohibition against disability discrimination. As a direct and proximate result of Defendant's unlawful actions in violation of the NYCHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which he is entitled to an award of damages.

81. Defendant's unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages. Plaintiff seeks all remedies available by statute.

**SECOND CAUSE OF ACTION**
**Failure to Engage in Cooperative Dialogue Under NYCHRL**

82. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

83. The NYCHRL imposes a stricter obligation on employers than federal law requires: employers must engage in "cooperative dialogue" with employees requesting reasonable accommodations. *See* N.Y.C. Admin. Code § 8-107(28).

84. Google systematically violated this obligation through multiple failures:

a. **Systematic Undermining of Existing Accommodation**: Rather than engaging in cooperative dialogue about Plaintiff's remote work needs, Ms. Lopez pressured him to abandon his existing accommodation, explicitly raising objections and displaying repeated hostility toward his remote status, including instructing him to work from an office where he had no business reason to be present;

b. **Refusal to Address Deteriorating Health**: When Plaintiff's health visibly deteriorated due to the hostile work environment and excessive workload, Google made no effort to engage in cooperative dialogue about additional accommodations, modified work arrangements, or schedule adjustments that could have addressed his medical needs;

c. **Dismissive Response to Protected Complaint**: When Plaintiff attempted to engage Ms. Lopez in dialogue about accommodations at the September 2024

offsite, she responded dismissively, telling him to "stomach it and get through it" and warning that complaints would hurt his career. Although Google maintains a small internal "HR for HR" team intended to support HR employees, that group has historically prioritized risk protection for Google and has been aligned with senior HR executives, making it effectively unavailable as an independent channel for support. This dynamic left Plaintiff with no safe avenue to raise concerns internally, reinforcing the power imbalance that enabled Ms. Lopez's conduct;

**d.** **Termination Rather Than Dialogue**: When Plaintiff disclosed his need for medical leave, Google chose to notify him of termination immediately before his leave began, demonstrating a deliberate effort to avoid its legal obligations;

**e.** **Post-Termination Exclusion**: Google's failure to include Plaintiff in the voluntary exit program while extending benefits to similarly situated employees demonstrates continued disparate treatment even during the separation process.

85. These failures constitute discrimination under the NYCHRL's strict cooperative dialogue requirements and otherwise demonstrate Google's discriminatory intent. As a direct and proximate result of Defendant's unlawful actions in violation of the NYCHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which he is entitled to an award of damages.

86. Defendant's unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages. Plaintiff seeks all remedies available by statute.

**THIRD CAUSE OF ACTION**
**Discrimination Under New York State Human Rights Law (NYSHRL) - Disability**

87. Plaintiff incorporates by reference all preceding paragraphs.

88. The NYSHRL provides broad protection against employment discrimination based on disability, and New York courts have held that these protections are more expansive than federal standards.

89. Under the NYSHRL, when an employee gives their employer reasonable notice of a need for accommodation (including when the employer should have known that dialogue may be warranted), the employer must engage in a good-faith interactive dialogue regarding the need for accommodations.

90. Google's termination of Plaintiff immediately upon learning of his medical leave violates both reasonable accommodation and anti-retaliation provisions of the NYSHRL. Google made no effort to comply with its duty to engage in good-faith accommodation discussions and instead hastily terminated Plaintiff, pressured him to abandon existing accommodations, and created a hostile environment for employees who require medical accommodations.

91. Google's conduct violates the NYSHRL's prohibition against disability discrimination. As a direct and proximate result of Defendant's unlawful actions in violation of the NYSHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which he is entitled to an award of damages.

92. Defendant's unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages. Plaintiff seeks all remedies available by statute.

**FOURTH CAUSE OF ACTION**
**Discrimination Under New York City Human Rights Law (NYCHRL) - Race**

93. Plaintiff incorporates by reference all preceding paragraphs.

94. Plaintiff is Black and a member of a protected class under the NYCHRL.

95. At least Plaintiff and another Black employee on the P&D HR team reporting to Ms. Lopez were involuntarily eliminated, while others were retained and offered the VEP, indicative of racial bias in the selection process. Moreover, no layoffs on Plaintiff's team were

necessary, meaning the targeting of multiple experienced Black employees for involuntary termination was not justified by business necessity. Broader patterns at Google demonstrate disparate treatment of Black employees and Google's disregard for subjective and biased decision-making targeting Black employees, such as Plaintiff.

96. Under the NYCHRL's liberal standard, Plaintiff needs only to show he was treated "less well" at least in part because of his race. Google's conduct violates the NYCHRL's prohibition against race discrimination.

97. As a direct and proximate result of Defendant's unlawful actions in violation of the NYCHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which he is entitled to an award of damages.

98. Defendant's unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages. Plaintiff seeks all remedies available by statute.

**FIFTH CAUSE OF ACTION**
**Discrimination Under New York State Human Rights Law (NYSHRL) - Race**

99. Plaintiff incorporates by reference all preceding paragraphs.

100. Plaintiff is Black and a member of a protected class under the NYSHRL.

101. The NYSHRL prohibits employment discrimination based on race and must be construed to prevent discriminatory employment practices. At least Plaintiff and another Black employee on the P&D HR team reporting to Ms. Lopez were involuntarily eliminated, while others were retained and offered the VEP, indicative of racial bias in the selection process. Moreover, no layoffs on Plaintiff's team were necessary, meaning the targeting of multiple experienced Black employees for involuntary termination was not justified by business necessity.

Broader patterns at Google demonstrate disparate treatment of Black employees and Google's disregard for subjective and biased decision-making targeting Black employees, such as Plaintiff.

102. Plaintiff's race was a motivating factor in Google's decision to select him for involuntary termination and exclude him from the favorable voluntary exit program. Google's conduct violates the NYSHRL's prohibition against race discrimination.

103. As a direct and proximate result of Defendant's unlawful actions in violation of the NYSHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which he is entitled to an award of damages.

104. Defendant's unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages. Plaintiff seeks all remedies available by statute.

**SIXTH CAUSE OF ACTION**
**Retaliation Under New York City Human Rights Law (NYCHRL)**

105. Plaintiff incorporates by reference all preceding paragraphs.

106. Plaintiff engaged in protected activity under the NYCHRL by complaining about discriminatory treatment at the September 2024 offsite, specifically addressing the high workload, hostile environment, inequitable treatment, and impact on his health due to disability discrimination.

107. Plaintiff also engaged in protected activity by requesting and utilizing reasonable accommodations for his disabilities throughout his employment. Google's warning that complaints would hurt his career, followed by escalated discriminatory conduct including, but not limited to, heightened performance scrutiny not applied to peers, exclusion from

opportunities and key meetings, pressure to abandon his reasonable accommodation, and hostile questioning about his career plans, constitutes unlawful retaliation.

108. Google's termination decision, made within weeks of Plaintiff's December 2024 notice of medical leave needs and just months after his September 2024 protected complaint, constitutes unlawful retaliation. Google's retaliatory conduct violates the NYCHRL. As a direct and proximate result of Defendant's unlawful actions in violation of the NYCHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which he is entitled to an award of damages.

109. Defendant's unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages. Plaintiff seeks all remedies available by statute.

**SEVENTH CAUSE OF ACTION**
**Retaliation Under New York State Human Rights Law (NYSHRL)**

110. Plaintiff incorporates by reference all preceding paragraphs.

111. Plaintiff engaged in protected activity under the NYSHRL by opposing discriminatory practices, including complaining about disability discrimination, requesting reasonable accommodations, and challenging the hostile treatment he received due to his protected characteristics.

112. Google took adverse employment actions against Plaintiff, including escalated scrutiny, exclusion from opportunities, pressure to abandon accommodations, and ultimate termination, in retaliation for his protected complaints and accommodation requests.

113. There is a causal connection between Plaintiff's protected activity and Google's adverse actions, established by the temporal proximity between his complaints and the adverse

actions, Google's explicit warning that complaints would hurt his career, and the pretextual nature of Google's stated reasons for termination.

114. Google's retaliatory conduct violates the NYSHRL. As a direct and proximate result of Defendant's unlawful actions in violation of the NYSHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which he is entitled to an award of damages.

115. Defendant's unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages. Plaintiff seeks all remedies available by statute.

**EIGHTH CAUSE OF ACTION**
**Interference with Rights Under the Family and Medical Leave Act (FMLA)**

116. Plaintiff incorporates by reference all preceding paragraphs.

117. Plaintiff was entitled to FMLA leave for his planned February 2025 medical leave and properly notified Google of his need for such leave.

118. Google interfered with Plaintiff's exercise of his FMLA rights by notifying of his termination one day before his approved FMLA leave was scheduled to begin.

119. Google's termination interfered with Plaintiff's ability to take FMLA leave, absent adverse treatment, and he was prevented from returning to his position after leave.

120. Google's conduct was willful, as evidenced by the deliberate timing of the termination notice immediately before Mr. Jean-Pierre's scheduled leave and the systematic hostility toward Plaintiff and other employees seeking medical leave.

121. Google's interference with Plaintiff's FMLA rights violates 29 U.S.C. § 2615(a)(1). Plaintiff is entitled to all statutory remedies, including economic damages (back and

front pay), interest, liquidated damages, and attorneys' fees and costs. Plaintiff seeks all remedies available by statute.

**NINTH CAUSE OF ACTION**
**Retaliation Under the Family and Medical Leave Act (FMLA)**

122. Plaintiff incorporates by reference all preceding paragraphs.

123. Plaintiff engaged in protected activity under the FMLA by requesting and seeking to take FMLA leave for his planned February 2025 leave.

124. Google took adverse action against Mr. Jean-Pierre by noticing his termination one day before his FMLA leave was scheduled to begin.

125. Google's termination was motivated, at least in part, by Plaintiff's request for and intent to take FMLA leave (i.e., Google considered his leave activity as a negative factor), as demonstrated by:

a. The timing of the termination notice was one day before the leave was to begin;

b. Ms. Lopez's dismissive response when Plaintiff informed her of his need for medical leave in December 2024;

c. The discriminatory comments by Google that employees were "abusing" medical leave; and

d. The targeting of Plaintiff for termination within weeks of his notice of medical leave needs.

126. The temporal proximity between Plaintiff's FMLA leave request and his termination creates a compelling inference of retaliation.

127. Google's retaliatory conduct was willful and violates 29 U.S.C. § 2615(a)(2). Plaintiff is entitled to all statutory remedies, including economic damages (back and front pay), interest, liquidated damages, and attorneys' fees and costs.

**TENTH CAUSE OF ACTION**
**Violation of New York Labor Law Section 215**

128. Plaintiff incorporates by reference all preceding paragraphs.

129. New York Labor Law Section 215 prohibits employers from retaliating against employees for using legally protected leave.

130. Plaintiff sought to use legally protected medical leave under federal and state law, including FMLA leave and disability-related leave.

131. Google terminated Plaintiff one day before his protected medical leave was scheduled to begin, in retaliation for his intent to use legally protected leave.

132. Google's discriminatory comments that employees were "abusing" medical leave, combined with the timing of Plaintiff's termination, demonstrate that his termination was motivated by his intent to use legally protected absence.

133. Google's conduct violates New York Labor Law Section 215. Plaintiff is entitled to all statutory remedies, including economic damages (back and front pay), interest, liquidated damages, and attorneys' fees and costs.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that Defendant's actions violated the aforementioned federal, state, and local civil rights laws;

B. Award compensatory damages in an amount to be determined at trial;

C. Award punitive damages under applicable law;

D. Award liquidated damages where available;

E. Award back pay, front pay, lost benefits, and other economic damages;

F. Award reasonable attorneys' fees and costs;

G. Award prejudgment and post-judgment interest;

H. Order Defendant to take appropriate actions, supported by the record, to remedy the effects of its unlawful employment practices; and

I. Grant such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated: December 2, 2025

Respectfully submitted,

*/s/ Zachary L. Rubin*

**ZLR Litigation, PLLC**
680 E Main Street, Suite A #638
Stamford, CT 06901
*and*
4 International Drive, 1st Floor
Rye Brook, NY 10573
(203) 212-9983
zach@ZLRlitigation.com

*Attorney for Plaintiff*